**INVERSA, S.A.**

and

**Assembly of Torre Miramar Condominium, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

**No. 01–220C.**

United States Court of Federal Claims.

Oct. 23, 2006.

---

Jon W. van Horne, Gaithersburg, Maryland, attorney of record for the Plaintiffs.

Brian S. Smith, Commercial Litigation Branch, Department of Justice, Washington, D.C., attorney of record for the Defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Robert E. Kirschman, Jr., Assistant Director, and James W. Poirier, Attorney.

Arielle Cohen, law clerk.

## ORDER/OPINION

BASKIR, Judge.

Of the seven counts originally in this landlord-tenant case concerning the U.S. Embassy in Panama, only Count 6, involving the rental of floors six and seven of the premises, remains unresolved. In an Opinion issued July 21, 2006, the Court found the Defendant liable for the rent on floors six and seven for the two-year renewal period starting March 15, 1998, and ordered the Parties to submit an accounting of the damages.

The Plaintiff submitted an accounting of damages totaling $256,879.43 which the Government opposed in part. The disagreement is now limited to a single issue: whether the unpaid rent is subject to interest penalties in the amount of $15,524.39 under the Prompt Payment Act (31 U.S.C. § 3901 *et. seq.*) ("PPA"). We conclude that because the Government denied its liability for the rent at the time it was due, the rental payment was in dispute and the PPA does not apply. **The Parties are hereby ORDERED to submit an agreed accounting of the unpaid rent amount for Count 6 and the interest owing under the Contract Disputes Act (41 U.S.C. § 601 *et. seq.*) ("CDA"). The Court will enter final judgment on all the remaining counts once the amount of damages for Count 6 has been established.**

### Discussion

I. *The Facts Relating to Count 6*

On March 13, 1997, the Defendant exercised its option to renew the entire Lease for an additional two-year period, from March 15, 1998, through March 14, 2000. Consolidated Statement of Uncontroverted Facts ("CSUF") ¶ 9, Pl.App. at 16. On February 20, 1998, the Defendant provided a notice that purported to terminate tenancy of the sixth and seventh floors as of March 14, 1998. CSUF ¶ 11, Pl.App. at 23. The Plaintiffs have consistently claimed that the termination was untimely under the terms of the Lease because it was sent less than 180 days before the beginning of the renewal period.

On March 5, 1998, Inversa refused to accept the termination and demanded payment for the full two-year period. CSUF ¶ 12, Pl.App. at 24. On March 12, 1998, after the Government submitted payment for other floors in the building, Inversa sent a second letter demanding payment for the sixth and seventh floors. CSUF ¶ 13, Pl.App. at 26. The record does not include the Government's direct response to this demand, but it is clear from a cable message from the Embassy to the Department of State that the Government was aware of the demand:

[Dr. Arias stated] that the USG was still liable for rental payments for floors 6, 7, 14 & 15. Dr. Arias' letter of March 12, 1998 addressed to contracting officer expressing this concern is being faxed to FBO for its review.

Dr. Arias refused to perform a walk-through, sign the termination and acquittance letter for floors 6 & 7 ... or accept the keys to floors 6 & 7....

Please review and advise post if additional steps need to be taken.

Pl.App. at 27–28. The Government did not pay any rent for the sixth and seventh floors until the Contracting Officer ordered partial payment in his April 20, 2000, decision. CSUF ¶ 17, Pl.App. at 14.

II. *The Prompt Payment Act*

The PPA provides for automatic payment of interest when the Government is late in making a payment for certain goods or services. The section relevant to the current dispute is § 3907, "Relationship to other laws." (Despite its title, the only other law addressed in § 3907 is the CDA). Subsection (a) of § 3907 provides that if an agency fails to pay an interest penalty required under the Act, the contractor may file a claim for the penalty under the CDA. Subsection (b) accomplishes two things: it provides a maximum time period of one year for accrual of PPA interest, and it provides that PPA and CDA interest do not accrue simultaneously. Once a CDA claim is filed, the CDA interest provisions apply. Subsection (c) is the source of the Parties' present disagreement. It provides that the PPA is not applicable when there is a dispute about a payment:

> Except as provided in section 3904 of this title, **this chapter does not require an interest penalty on a payment that is not made because of a dispute between the head of an agency and a business concern over the amount of payment or compliance with the contract.** A claim related to the dispute, and interest payable for the period during which the dispute is being resolved, is subject to the Contract Disputes Act of 1978.

31 U.S.C. § 3907(c) (emphasis added).

The Plaintiffs argue that the language of the PPA addresses only two narrow types of disputes: situations in which liability for a payment is conceded but the dollar amount of the payment is disputed or, citing legislative history, disputes over the *contractor's* compliance with a contract (H.R.Rep. No. 100–784, at 11 (1988) reprinted in 1988 U.S.C.C.A.N. 3036, 3039). The Plaintiffs argue that neither the dollar amount of rent due under the lease nor their own performance was ever disputed by the Government.

The Court rejects this artificial reading of "disputes" under the PPA. The Government's denial of liability for the rent on floors six and seven is very obviously a dispute over the amount of payment: the Plaintiffs' position was that the Government owed something upwards of $300,000, while the Government's position was that it owed nothing.

Cases interpreting the PPA contain very little discussion of what constitutes a "dispute" under the Act. However, the case outcomes indicate that PPA interest is available only when Government payments are inadvertently late, and *not* when the Government refuses to pay or questions its underlying liability.

For example, in *Gutz v. U.S.*, 45 Fed.Cl. 291 (1999), the court granted PPA interest on only one portion of the Government's debt. The *Gutz* plaintiffs signed a settlement agreement with the U.S. Soil Conservation Service ("SCS") for repayment of amounts the agency wrongfully withheld in 1993 and 1994. The SCS paid only the 1994 amount, and paid it late. The SCS claimed that the 1993 amount was not included in the terms of the settlement agreement. The court found the Government's argument wholly unsupported by the language of the agreement, and ordered payment of the 1993 amount. However, the court *did not* award PPA interest on the 1993 payment because that payment was "in dispute." The court *did* award PPA interest on the 1994 payment for the period before it was paid because the Government never disputed its liability for the 1994 payment. *Gutz* at 298–99.

The court in *Southern Comfort Builders, Inc. v. U.S.*, 67 Fed.Cl. 124 (2005) similarly awarded PPA interest on only some of the amounts owed to plaintiffs by the Government. The court awarded PPA interest only for two small contract modifications that created additional work for plaintiffs. The Government did not deny its liability for the modifications; it simply failed to pay for them. *Southern Comfort* at 156–57.

The PPA's legislative history also demonstrates that the Act was intended only to remedy administrative delays and inefficiencies in Government payment of debts. Con-

gress first enacted the PPA in 1982 (P.L. 97–177), and amended it in 1988 to make it more binding on agencies (P.L. 100–496). When enacting the 1988 amendments, Congress stated the purpose of the PPA, focusing on the need to improve Government efficiency:

> The Prompt Payment Act of 1982 was enacted in order to provide incentives for the Federal Government to pay its bills on time. It had become apparent that the Government's bill paying record was so poor that many companies were being discouraged from competing for the Government's business and those that did compete were being encouraged to inflate their bids to reflect anticipated financing costs to cover late payments.

(H.R.Rep. No. 100–784 at 9 (1988) reprinted in 1988 U.S.C.C.A.N. 3036, 3036–37).

The 1988 amendments were specifically intended to improve agency compliance with the original PPA. Non-compliance was often the result of inconsistent or outdated management practices:

> Since passage of the act in 1982, some agencies have not appropriately determined when a proper invoice is deemed to have been received ... A Navy command may hold an invoice for 30 days before forwarding it to its payment center. The payment center, in turn, may determine that the invoice was received, for purposes of measuring timely payment, only at the time it arrived at the payment center and then hold it for another 30 days before making what it considers to be timely payment. Similar situations may occur in agencies throughout the Government.

(*Id.* at 14, 3042)

> A major complaint of witnesses during the subcommittee hearings was that, even though the act requires agencies to pay interest penalties at the time they become due, agency payments often do not include such a penalty.... In a review of payment practices by military exchanges, GAO reported that, almost 6 years after enactment of the act, some automated payment systems did not have features to identify late payments and to include any applicable interest penalties with payment checks.

(*Id.* at 18, 3046).

As these excerpts demonstrate, when enacting the PPA, Congress was concerned with administrative problems such as failures to forward paperwork, outdated payment systems, and general inefficiency, not disagreements over the Government's underlying liability. Disputed debts were already addressed by the Contract Disputes Act, which also contains interest provisions.

## III. *Conclusion*

Since submitting the February 20, 1998, termination notice, the Government's position has been that it had no liability for floors six and seven. The Plaintiffs' position has been that the termination was untimely and the Government was liable for the full rent. This disagreement has endured for over eight years and carried the Parties all the way to this Court. That most certainly constitutes a dispute within the meaning of the PPA. Therefore, the Plaintiffs are not entitled to PPA interest.

IT IS SO ORDERED.